Michael Brooks (SBN 272053)
Maria Bourn (SBN 269322)
GOMERMAN, BOURN & ASSOCIATES
825 Van Ness Avenue, Suite 502
San Francisco, CA 94109
Telephone:    (415) 545-8608
Fax:              (855) 545-8608
Email:           maria@gobolaw.com
                     michael@gobolaw.com

Attorneys for Plaintiff
Bob Luong

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

Case No.  5:24-cv-02440-SVK

BOB K. LUONG, an individual,

Plaintiff,

v.

SUPER MICRO COMPUTER, INC., a
Delaware corporation, and
CHARLES LIANG, an individual,

Defendants.

**FIRST AMENDED
COMPLAINT FOR DAMAGES:**

(1) Whistleblower Retaliation in Violation of
the Sarbanes-Oxley Act of 2002 (18 U.S.C.
§ 1514A);

(2) Whistleblower Retaliation in Violation of
California Labor Code Section 1102.5; and

(3) Retaliation in Violation of the FEHA.

**DEMAND FOR JURY TRIAL**

Plaintiff BOB K. LUONG ("Plaintiff") alleges against SUPER MICRO COMPUTER,

INC. and CHARLES LIANG (collectively, "Defendants"), and each of them, as follows:

**INTRODUCTION**

1.      Defendants retaliated against and ultimately fired Plaintiff because he engaged in

protected activity by: (i) reporting that Defendants were engaging in misleading accounting

practices that he reasonable believed to violate the rules and regulations of the Securities and

Exchange Commission ("SEC"); (ii) reporting that his supervisor engaged in unlawful age

discrimination; and (iii) refusing to acquiesce in Defendants' unlawful activity. Defendants'

retaliation against Plaintiff for engaging in protected activity violates the Sarbanes-Oxley Act of

2002 ("SOX"), California Labor Code section 1102.5, and the California Fair Employment and Housing Act ("FEHA").

**THE PARTIES**

2.      Plaintiff is an individual who resides within Santa Clara County, California.

3.      Defendant SUPER MICRO COMPUTER, INC. ("Super Micro") is a Delaware corporation company with its principal office located at 980 Rock Avenue, San Jose, California 95131. Super Micro is a public company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78l).

4.      Defendant CHARLES LIANG ("CEO Liang") is an individual who, on information and belief, resides in California. CEO Liang is, and at all relevant times has been, employed by Super Micro and has been its Chief Executive Officer.

5.      Each of the Defendants was in some manner responsible for the acts and damages alleged herein, or is indebted to Plaintiff as alleged herein, and each defendant participated in the acts alleged herein and, in participating in such acts, each defendant was the agent and co-conspirator of each other defendant and was acting in the course and scope of such agency and conspiracy.

**JURISDICTION**

6.      The Court has jurisdiction over Plaintiff's SOX whistleblower retaliation claim under 18 U.S.C. § 1514A(b)(1)(B). The Court also has federal question jurisdiction over the claim under 28 U.S.C. § 1331.

7.      The Court has supplemental jurisdiction over Plaintiff's whistleblower retaliation claim in violation of California Labor Code section 1102.5 under 28 U.S.C. § 1367 because the claim is so related to Plaintiff's SOX whistleblower retaliation claim that the claims form part of the same case or controversy under Article III of the United States Constitution.

8.      The Court has supplemental jurisdiction over Plaintiff's FEHA retaliation claim under 28 U.S.C. § 1367 because the claim is so related to Plaintiff's SOX whistleblower retaliation claim that the claims form part of the same case or controversy under Article III of the United States Constitution.

COMPLAINT

**VENUE**

9.     Venue is proper in the Northern District of California under 28 U.S.C § 1391 because: (i) one or more of the Defendants reside within the Northern District of California and Defendants are all residents of the State of California; and (ii) a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in the Northern District of California.

10.    Intra-district assignment to the San Jose Division is proper under Local Rule 3-2(e) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Santa Clara County.

**STATEMENT OF FACTS**

11.    Super Micro hired Plaintiff in 2012 as Director, Technology Enabler.

12.    In 2015, Super Micro elevated Plaintiff to the position of Senior Director, Technology Enabler and then to General Manager, Service and Strategic Solutions. As General Manager, Plaintiff was responsible for providing thought leadership and strategic guidance for Super Micro's Global Service team.

13.    Super Micro manufactures and sells high-performance and high-efficiency servers, server management software, and storage systems for various markets, including enterprise data centers, cloud computing, artificial intelligence, 5G and edge computing.

14.    Through its Global Service team, Super Micro provides post-sale maintenance and other support services to purchasers of its equipment and solutions.

15.    Super Micro and CEO Liang have a documented history of prematurely recognizing revenue and understating expenses in violation of Generally Accepted Accounting Principles ("GAAP") and the antifraud, books and records, and internal accounting controls provisions of the federal securities laws and regulations.

16.    On August 25, 2020, the Securities and Exchange Commission ("SEC") issued cease and desist orders against Super Micro and CEO Liang prohibiting them from continuing to violate certain securities laws and SEC rules and imposing significant monetary sanctions. *See* Exhibit 1 (Super Micro Order) and Exhibit 2 (CEO Liang Order).

COMPLAINT

17.     On information and belief, while addressing its past fraudulent accounting activity, Super Micro terminated several employees associated with its unlawful activities, including SVP of Sales Phideas Chou, SVP of Marketing Tau Leng, VP of Sales Gloria Sun, VP of Sales Salim Fidel, VP of Sales Nelson Wang, VP of Finance Peggy Lin, and others. In addition, Director Wally Liaw resigned from the board and his SVP of Sales role.

18.     Though Super Micro and CEO Liang appeared to curtail its unlawful activities for a brief period during and following the SEC enforcement action and were able to get the company relisted on the NASDAQ in January 2020, by the end of 2020, just weeks after the SEC cease and desist orders were issued, Defendants began again engaging in various accounting schemes—*e.g.*, improper revenue recognition, circumvention of internal accounting controls, shipping product with known issues, and providing service support to customers without service — to unlawfully overstate revenue and/or shift revenue between business units.

19.     Plaintiff resisted and, in some instances, refused to go along with Defendants' schemes because he reasonably believed the schemes violated GAAP and SEC accounting rules.

20.     **Improper Revenue Recognition**. On information and belief, Defendants improperly recognized revenue for equipment sales to multiple large customers in Q2[1] of 2020.

21.     **Recognizing Incomplete Sales**. One method Defendants utilized to recognize revenue early was to recognize sales that had not been completed. Despite knowing that certain sales would not be completed in Q2—*i.e.*, that the equipment would not be delivered, installed, and/or function in Q2 in accordance with applicable contract obligations—Super Micro nevertheless recognized the revenue associated with the sales in Q2 rather than Q3 of 2020 or later when its contractual obligations had been satisfied.

22.     **Shipping Product with Known Issues**. Another method Defendants utilized to recognize revenue early was to ship and bill certain customers for incomplete equipment that was not ready for sale, including equipment lacking key components necessary to its operation that

---

[1] Super Micro utilizes a July 1 to June 30 fiscal year (Q1 runs July through September; Q2 runs October through December; Q3 runs January through March; and Q4 runs April through June).

could not be shipped and/or installed until later quarters and equipment with key components (e.g., pre-release processors) that Super Micro was not authorized to resell.

23.     **Circumvention of Internal Accounting Controls**. Beginning in Q2 of 2020, many of the management personnel changes that had resulted from the SEC enforcement action and guidance from external auditors began to erode. During 2020, Sara Liu, CEO Liang's wife, returned to an active management role within the company. On information and belief, she had previously relinquished her management role to appease the external auditors.  In January 2021, Super Micro Chief Financial Officer ("CFO") Kevin Bauer resigned, and David Wiegand became CFO. Mr. Weigand was also performing the role of Chief Compliance Officer ("CCO") at the time. The combined roles consolidated power and further eroded internal controls.

24.     Beginning in approximately March 2021, Defendants also began to rehire employees associated with the prior unlawful accounting actions. Peggy Lin ("CAO Lin") was brought back and quickly ascended to the role of Chief Administrative Officer. On information and belief, CAO Lin, Sara Liu, and Edmond Liu (Sara's brother) actively negotiated with Compuware and Compuware CEO Bill Liang, CEO Liang's brother, to delay vendor payment and adjust other terms of sale while still allowing early recognition of revenue irrespective of delay in vendor payments.

25.     Other examples of eroding internal controls included: (i) assigning product manager to act as service manager; (ii) approving service contracts in circumvention of existing approval process and controls; and (iii) refusing to allow personnel to revalue inventory to write off obsolete and missing equipment.

26.     **Shifting Revenue between Business Units.** Without justification, Defendants disregarded the company's prior accounting practices regarding the allocation of revenue between service and hardware—practices that were adopted in accordance with GAAP and validated by CFO Kevin Bauer and external auditors in the context of the SEC enforcement action—and began allocating a larger amount of revenue to the hardware business to make that business line appear more profitable. For example, beginning January 1, 2022, Super Micro made an accounting change with respect to revenue received from its top four customers. It significantly reduced the

allocation of overall revenue attributed to service from approximately 7 percent of revenue to approximately 1.4 percent of revenue for these four customers only. Defendants justified this change with the dubious explanation that the four customers did not need as much service as other customers.

27.     In December 2020, Plaintiff reported to Kenneth Cheung (controller overseeing revenue recognition) that Jenny Lau (Mr. Chueng's subordinate) had incorrectly allocated more than $10 million dollars of revenue to hardware sales rather than service, which misleadingly overstated the profitability margin associated with the hardware sales.

28.     In December 2020 and January 2021, Plaintiff reported his concerns regarding revenue recognition and revenue allocation to CFO Kevin Bauer who in turn met with CEO Liang to discuss Plaintiff's concerns.

29.     In May 2021, Plaintiff met with Super Micro's human resources personnel ("HR") on several occasions and reported that individuals directly responsible for many of the violations found by the SEC were being rehired.

30.     In January 2022, Plaintiff was asked to approve the accounting change with respect to revenue received from its top four customers but refused to do so because of his concerns that the change violated SEC accounting rules.

31.     On February 9, 2022, Plaintiff reported to CEO Liang, HR, and his manager, Henry Kung, that Mr. Kung had made discriminatory comments based on age during the hiring of an employee that Plaintiff supervised. Plaintiff reported this information after becoming aware that employee had reported to HR that Mr. Kung was harassing and threatening to fire him if he escalated a product quality issue.

32.     On March 8, 2022, Plaintiff filed an internal complaint with Super Micro formalizing the concerns he had been raising with HR and other management since 2021 regarding the hiring of employees who had engaged in prior unlawful activity. The complaint also reported retaliation against Plaintiff and the Global Service team.  Plaintiff also filed a complaint with Ethicspoint raising similar issues at approximately the same time.

33.     During March and April 2022, Plaintiff continued to inform Mr. Kung and accounting staff about what he believed to be unlawful departures from proper accounting practices.

34.     After Plaintiff's 2022 complaints, the retaliation against him and his staff intensified. Plaintiff's variable compensation continued to decline even as revenue continued to increase. Plaintiff's attempts to onboard new staff were disapproved of by Mr. Kung. Resource requests and other types of routine requests for approvals sent to Mr. Kung were ignored or delayed for weeks.  Mr. Kung and his staff were openly hostile in communications with Plaintiff and his staff. In June 2022, Mr. Kung unreasonably refused to provide Plaintiff's team with access to an integral company database called PDBS impeding the ability of Plaintiff and his team to service Super Micro's customers.

35.     In October 2022, Super Micro's legal department requested a meeting with Plaintiff to discuss an HR item. Plaintiff requested but was not provided with a more specific topic of discussion for the meeting by the legal department. Plaintiff asked the Chief Compliance Officer to also attend the meeting and that request was rejected by the legal department. Plaintiff made himself available to meet by phone or in his office. The legal department refused.

36.     On October 14, 2022, Super Micro placed Plaintiff on involuntary paid administrative leave.

37.     On December 16, 2022, Super Micro placed Plaintiff on involuntary unpaid administrative leave.

38.     On April 12, 2023, Super Micro terminated Plaintiff's employment.

**EXHAUSTION OF ADMINISTRATIVE REMEDIES**

39.     On April 15, 2023, Plaintiff, though counsel, timely submitted his administrative SOX Whistleblower Retaliation Complaint to the Occupational Safety and Health Administration ("OSHA") via facsimile within the 180-day statute of limitation period as required under 18 U.S.C. § 1514A(b)(2)(D) and 29 C.F.R. § 1980.103.

40.     More than 180 days have now passed since Plaintiff's administrative SOX Whistleblower Retaliation Complaint was filed. No action has been taken on the complaint by

COMPLAINT

OSHA or any other designee of the Secretary of Labor and no final decision has been rendered. Thus, Plaintiff has exhausted administrative remedies for his SOX Whistleblower Retaliation Complaint and may seek relief in this Court under 18 U.S.C. § 1514A(b)(1)(B).

41.     Under California Labor Code section 244, Plaintiff is not required to exhaust administrative remedies prior to bringing a civil action for a violation of California Labor Code section 1102.5.

42.     On or about April 3, 2024, by and through counsel, Plaintiff filed an administrative complaint against Super Micro alleging retaliation in violation of the Fair Employment and Housing Act ("FEHA") with the California Civil Rights Department and obtained an immediate right to sue notice.

## CLAIMS

### First Cause of Action
### SOX WHISTLEBLOWER RETALIATION
### (18 U.S.C. § 1514A)
(Against All Defendants)

43.     Plaintiff re-alleges and incorporates by reference the foregoing allegations as though set forth herein.

44.     Plaintiff engaged in whistleblowing activity protected by SOX by reporting that Defendants were engaging in misleading accounting practices—*i.e.*, improperly recognizing revenue early, improperly shifting revenue between business units, and improperly eroding internal accounting controls—that he reasonable believed to violate GAAP and SEC rules and regulations.

45.     Plaintiff also engaged in whistleblowing activity protected by SOX by resisting and refusing to acquiesce in misleading accounting practices he reasonably believed violated GAAP and SEC accounting rules.

46.     Defendants knew that Plaintiff engaged in protected activity.

47.     Plaintiff suffered an adverse employment action, including but not limited to being involuntarily placed on administrative leave and then fired ("the adverse employment action").

48.     Plaintiff's protected activity was a contributing factor in the adverse employment

action.

49. As a direct and proximate result of the adverse employment action, Plaintiff has and continues to suffer lost wages and other benefits of employment and is therefore entitled to an award of compensatory damages against Defendants for said suffering, inclusive of prejudgment interest, in an amount to be proven at trial.

50. As a direct and proximate result of Defendants adverse employment action, Plaintiff has and continues to suffer emotional distress, suffering, grief, sadness, worry, shock, humiliation, frustration, anguish, and nervousness and is therefore entitled to an award of compensatory damages against Defendants for said suffering in an amount to be proven at trial.

51. Plaintiff is further entitled to reinstatement of his employment with Defendants.

52. Plaintiff is further entitled to an award against Defendants for his litigation costs, reasonable attorney's fees, and expert witness fees.

## Second Cause of Action
### LABOR CODE SECTION 1102.5 WHISTLEBLOWER RETALIATION
(Against Super Micro)

53. Plaintiff re-alleges and incorporates by reference the foregoing allegations as though set forth herein.

54. Super Micro was Plaintiff's employer.

55. Plaintiff engaged in whistleblowing activity protected by Labor Code section 1102.5, subdivision (b), by: (i) reporting unlawful activity he reasonably believed violated GAAP and SEC accounting rules to agents of Super Micro with authority over Plaintiff and/or with authority to investigate, discover, or correct the legal violations complained about; and (ii) reporting that his supervisor, Mr. Kung, had engaged in age discrimination in violation of the FEHA to agents of Super Micro with authority over Plaintiff and/or with authority to investigate, discover, or correct the legal violations complained about.

56. Plaintiff engaged in whistleblowing activity protected by Labor Code section 1102.5, subdivision (c), by: (ii) resisting and refusing to participate in activity that would violate GAAP and SEC accounting rules.

COMPLAINT

57.     Plaintiff had reasonable cause to believe that the information he provided to Super Micro (and agents of Super Micro with authority over Plaintiff and/or with authority to investigate, discover, or correct the legal violations complained about) disclosed violations of the GAAP, SEC accounting rules, and FEHA.

58.     Super Micro discharged Plaintiff from employment and otherwise discriminated against him in the terms, conditions, and privileges of employment.

59.     Plaintiff's protected activity was a substantial motivating reason for Super Micro's decision to take adverse actions against him and discharge him from employment.

60.     As a direct and proximate result of Super Micro's adverse employment actions against him, Plaintiff has and continues to suffer lost wages and other benefits of employment and is therefore entitled to an award of compensatory damages against Super Micro for said suffering, inclusive of prejudgment interest, in an amount to be proven at trial.

61.     As a direct and proximate result of Super Micro's adverse employment actions against him, Plaintiff has and continues to suffer emotional distress, suffering, grief, sadness, worry, shock, humiliation, frustration, anguish, and nervousness and is therefore entitled to an award of compensatory damages against Super Micro for said suffering in an amount to be proven at trial.

62.     Plaintiff is further entitled to reinstatement of his employment with Super Micro.

63.     Plaintiff is further entitled to an award of exemplary and punitive damages in an amount to be proven at trial because the retaliation against Plaintiff constitutes oppression, fraud or malice. On information and belief: (i) the above-described acts were willful, intentional, and malicious and done with the intent to vex, injure, and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish Super Micro and to deter others from engaging in similar conduct; and (ii) Super Micro authorized and ratified the wrongful acts of its agents and employees, knew in advance that its agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others. Further, on information and belief: One or more of Super Micro's officers, directors, or managing agents who was acting on behalf of Super Micro: (i) were themselves guilty of

oppression, fraud, and malice; (ii) had advance knowledge of the unfitness of Super Micro's employees or agents who retaliated against Plaintiff and employed them with a knowing disregard for the rights and safety of others, authorized their conduct, or knew of their conduct and adopted or approved of the conduct after it occurred; or (iii) adopted or approved of the retaliatory conduct against Plaintiff after they became aware of the conduct regardless of the identity of the employees or agents responsible for the conduct.

64.     Plaintiff is further entitled to an award against Super Micro for costs of suit, including his reasonable attorney's fees.

### THIRD CAUSE OF ACTION
**FEHA RETALIATION**
**[Cal. Gov. Code, § 12940, subd. (h)]**
(Against Super Micro)

65.     Plaintiff re-alleges and incorporates by reference the foregoing allegations as though set forth herein.

66.     Plaintiff engaged in activity protected under the FEHA by reporting that his supervisor, Mr. Kung, had engaged in age discrimination in violation of the FEHA to agents of Super Micro with authority over Plaintiff and/or with authority to investigate, discover, or correct the legal violations complained about.

67.     Super Micro discharged Plaintiff from employment and otherwise discriminated against him in the terms, conditions, and privileges of employment.

68.     Plaintiff's protected activity was a substantial motivating reason for Super Micro's decision to take adverse actions against him and discharge him from employment.

69.     As a direct and proximate result of Super Micro's adverse employment actions against him, Plaintiff has and continues to suffer lost wages and other benefits of employment and is therefore entitled to an award of compensatory damages against Super Micro for said suffering, inclusive of prejudgment interest, in an amount to be proven at trial.

70.     As a direct and proximate result of Super Micro's adverse employment actions against him, Plaintiff has and continues to suffer emotional distress, suffering, grief, sadness, worry, shock, humiliation, frustration, anguish, and nervousness and is therefore entitled to an

COMPLAINT

award of compensatory damages against Super Micro for said suffering in an amount to be proven at trial.

71.    Plaintiff is further entitled to reinstatement of his employment with Super Micro.

72.    Plaintiff is further entitled to an award of exemplary and punitive damages in an amount to be proven at trial because the retaliation against Plaintiff constitutes oppression, fraud or malice. On information and belief: (i) the above-described acts were willful, intentional, and malicious and done with the intent to vex, injure, and annoy Plaintiff and warrant the imposition of exemplary and punitive damages in an amount sufficient to punish Super Micro and to deter others from engaging in similar conduct; and (ii) Super Micro authorized and ratified the wrongful acts of its agents and employees, knew in advance that its agents and employees were likely to commit such acts and employed them with conscious disregard of the rights or safety of others. Further, on information and belief: One or more of Super Micro's officers, directors, or managing agents who was acting on behalf of Super Micro: (i) were themselves guilty of oppression, fraud, and malice; (ii) had advance knowledge of the unfitness of Super Micro's employees or agents who retaliated against Plaintiff and employed them with a knowing disregard for the rights and safety of others, authorized their conduct, or knew of their conduct and adopted or approved of the conduct after it occurred; or (iii) adopted or approved of the retaliatory conduct against Plaintiff after they became aware of the conduct regardless of the identity of the employees or agents responsible for the conduct.

73.    Plaintiff is further entitled to an award against Super Micro for costs of suit, including his reasonable attorney's fees and expert witness fees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff hereby prays that the Court enter judgment in his favor and against Defendants, and each of them, as follows:

A.    Compensatory damages according to proof;

B.    General damages according to proof;

C.    Special damages according to proof;

D.    Statutory damages;

E.       Punitive damages;

F.       Prejudgment interest according to law;

G.       Costs of suit, including reasonable attorney's fees and expert witness fees as authorized by statute;

H.       Equitable relief, including injunctive relief and declaratory relief; and

I.       Any other and further relief that the Court considers just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury on all issues.

DATED: May 6, 2024                           GOMERMAN, BOURN & ASSOCIATES


By: _____
        Michael Brooks
        Attorneys for Plaintiff

COMPLAINT

Exhibit 1

## UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

**SECURITIES ACT OF 1933**
**Release No. 10822 / August 25, 2020**

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 89656 / August 25, 2020**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4161 / August 25, 2020**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-19927**

|  |  |
|---|---|
| In the Matter of<br><br>**SUPER MICRO COMPUTER, INC.,**<br><br><br>**Respondent.** | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 8A OF THE SECURITIES ACT OF 1933 AND SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

### I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 8A of the Securities Act of 1933 ("Securities Act") and Section 21C of the Securities Exchange Act of 1934 ("Exchange Act"), against Super Micro Computer, Inc. ("Super Micro" or "Respondent").

## II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over it and the subject matter of these proceedings, which are admitted, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933 and Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      Super Micro Computer, Inc., a producer of computer servers headquartered in California, engaged in improper accounting—prematurely recognizing revenue and understating expenses from at least fiscal year ("FY") 2015 through FY 2017.[2] As a result, Super Micro filed with the Commission materially misstated financial statements in its annual, quarterly and current reports during the period.

2.      Super Micro's executives pushed employees to maximize end-of-quarter revenue and minimize expenses, without devising and maintaining sufficient internal accounting controls to record revenue and expenses in conformity with U.S. Generally Accepted Accounting Principles ("GAAP"). Super Micro improperly accelerated revenue recognition and reporting by: (1) recognizing revenue before delivering the goods to customers; (2) sending goods to customers prior to the customer-specified delivery date; (3) improperly changing the shipment terms to a large Super Micro customer in order to recognize revenue upon shipment rather than when the goods were delivered to the customer; (4) recognizing revenue with respect to transactions that included customer acceptance terms before the customers had accepted the goods; (5) sending incomplete or mis-assembled goods to customers at the end of quarters; (6) recognizing revenue on sales to a large distributor upon shipment, when the revenue should have been recognized when Super Micro received payment from the distributor; (7) holding the bill of lading for certain

---

[1]     The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

[2]     Each of Super Micro's quarterly reports on Form 10-Q and annual reports on Form 10-K beginning with the period ended September 30, 2014 through the period ended March 31, 2017 contained materially misstated financial statements. The Company's current reports on Form 8-K, announcing the financial and operational results for each of these periods, along with the current report filed on August 3, 2017, announcing results for the year ended June 30, 2017, also contained materially misstated financial information.

overseas customers and thus preventing the customers from taking possession of the goods as a means to ensure payment, but nevertheless improperly recognizing the revenue upon shipment; and (8) recognizing certain extended warranty revenue at the time of sale, rather than amortizing the revenue over the length of the warranty.

3. Super Micro also improperly under-reported certain expenses by misusing its cooperative marketing program to pay a variety of unrelated expenses, such as warehousing costs for goods at quarter end, shipping costs, and product repair costs. Super Micro employees also submitted claims for funds to which Super Micro was not entitled in connection with a vendor's cooperative marketing program. In addition, Super Micro over-valued inventory and under-stated expenses by failing to reduce inventory and record an associated expense in instances where Super Micro no longer held the inventory for sale.

4. Accordingly, Super Micro violated certain antifraud, reporting, books and records, and internal accounting controls provisions of the federal securities laws.

## Respondent

5. Super Micro is a global producer of computer servers and equipment, incorporated in Delaware, with its principal place of business in San Jose, California. Super Micro's securities are registered under Section 12(b) of the Exchange Act. The company's fiscal year ends on June 30. Super Micro's shares currently trade on the NASDAQ Global Select Market. Because of Super Micro's pervasive accounting, reporting and internal accounting control issues, Super Micro was unable to file periodic reports for nearly two years and, as a result, trading in the company's stock was suspended in August 2018 and the stock was then delisted from March 2019 through January 2020. During the relevant period, Super Micro offered and sold stock to its employees pursuant to registration statements on Forms S-8 dated April 26, 2007 and April 22, 2016.

## Facts

### A. Premature Revenue Recognition and Reporting

6. In determining whether to recognize and report revenue during the relevant period, GAAP required public companies to consider whether (1) the revenue is realized or realizable; and (2) the revenue is earned. Consistent with GAAP, Super Micro's revenue recognition policy provides that revenue is realized and earned when all of the following criteria are met: (a) persuasive evidence of an arrangement exists; (b) delivery has occurred or services have been rendered; (c) the seller's price to the buyer is fixed or determinable; and (d) collectability is reasonably assured.

7. Super Micro executives pressed employees to maximize revenue at the end of quarters but failed to devise and maintain sufficient internal accounting controls with respect to proper revenue recognition. For instance, Super Micro delegated responsibility for identifying sales terms that may affect revenue recognition to salespeople without training them on revenue recognition. During the period from at least FY 2015 through the end of FY 2017, Super Micro

3

systemically recognized, recorded in its books and records, and reported revenue prematurely by engaging in the following improper practices.

***Premature Revenue Recognition Prior to Customer Delivery***

8.      Super Micro engaged in a number of transactions where it recognized revenue prior to customer delivery in order to maximize revenue at the end of quarters.  In certain instances, Super Micro employees sent goods to warehouses or other storage facilities controlled by third parties at quarter-end and paid for the storage fees until the goods were delivered to its customer. In other instances, Super Micro asked its freight forwarders to hold the goods until the date that the customer was prepared to accept the goods, rather than ship and deliver them on the date agreed to with the customer.  There also were instances where Super Micro recorded revenue although goods remained at its own warehouse.

9.      For example, Super Micro asked a distributor customer to agree to accept approximately $104,000 of goods before the end of FY 2015 in order to recognize revenue during that period.  The customer, however, did not need additional product at the time and did not have space for the product.  Super Micro ultimately arranged to pay for trailers where the goods would be stored.  At least some of the goods remained in the trailers for approximately six months.

10.      In addition, a different customer requested that Super Micro deliver nearly $800,000 worth of goods by mid-January 2015.  Super Micro requested that its freight forwarder pick up the goods before the end of December 2014, and improperly recorded the sale in the second quarter of FY 2015.  Super Micro employees instructed its freight forwarder to unload the goods at the freight forwarder's dock and then deliver the goods to the customer two weeks later.

11.      In another instance, a Super Micro salesperson stored a small amount of goods in her car when Super Micro's customer was unable to pick up the goods by the end of the quarter, yet Super Micro improperly recognized the revenue on the last day of the quarter.

12.      In all of these transactions and other similar transactions, Super Micro improperly recorded revenue upon shipment from its own facility but prior to customer delivery or, in a few instances, before the goods even left its facility.  Recognizing the revenue was not in conformity with GAAP.

***Improper Recognition of Revenue Upon Shipment of Goods Without Customer Authorization***

13.      Super Micro—at the end of quarters—shipped goods on multiple occasions prior to the delivery dates agreed with, or specified by, its customers in order to record and recognize the revenue prior to quarter-end.

14.      For example, at the end of FY 2017, Super Micro shipped product to a customer who had not wanted the goods delivered for another month.  A few days after the shipment, the customer stated "Please reject this shipment . . . Why are you shipping this now?"  In response, the Super Micro salesperson requested "Can you please help to approve this shipment to help with our

quarter end?  I was instructed by our management to push all the orders out before our quarter end which is also our year end. . . . we will just need your special support for this time."  The customer again rejected the request.  Nevertheless, the revenue was improperly recognized at the time of shipment.

15.     Similarly, on the last day of FY 2017, Super Micro shipped more than $278,000 of goods to a customer.  In the days preceding the shipment, Super Micro employees repeatedly asked the customer to allow the goods to ship, although the employees understood that the customer did not have space for the goods.  Ultimately, the customer instructed Super Micro not to ship out the goods until early July 2017.  A Super Micro employee, however, informed the customer that the goods had already been shipped and Super Micro improperly recorded the revenue in the fourth quarter of FY 2017.

16.     In another example, at the end of the second quarter of FY 2017, a distributor customer indicated that over $250,000 of goods could not be shipped absent its authorization.  A Super Micro employee still shipped the goods before quarter-end.  The customer's representative complained that "no one can command you to process [our] order w/o our permission."  Super Micro improperly recognized the revenue in the second quarter of FY 2017.

17.     Super Micro's recognition of revenue when it shipped goods in contravention of customer instructions did not conform with GAAP.

***Improper Recognition of Revenue Upon Shipment to a Large Super Micro Customer Where the Parties' Shipping Terms Required Revenue to Be Recognized Upon Delivery***

18.     From at least 2014 through 2017, purchase orders submitted by a large Super Micro customer specified "FOB Destination" as the shipping terms.  Sales with FOB Destination shipping terms are not realized or earned until delivery has occurred at the customer-designated location and title to the goods has passed to the customer.  Super Micro, however, improperly recorded revenue upon shipment to the customer.

19.     Many shipments to this customer occurred near the end of quarters.  During most quarters over the relevant period, Super Micro's employees sent emails to the customer's employees, purporting to change the shipping terms to "ex works", which generally means that the goods and title would pass to the customer when picked up at Super Micro's warehouse.  The emails purporting to change the shipping terms, however, were often sent to the customer after the goods had been shipped and the quarter had ended.  Indeed, in many instances, the purported change in terms occurred after the customer had already received the goods—*i.e.*, after the question of who would bear the risk of loss while the goods were in transit was moot.

20.     In addition, on one occasion a lower-level sales employee fabricated an email purporting to be from this customer, stating that Super Micro could use "ex works" shipping terms for open, current and future orders.  The email was used by Super Micro to recognize revenue upon shipment during several periods.

5

21.     In addition to these problems with the timing, and authenticity, of emails purporting to change shipping terms, the emails were insufficient to override the customer's purchase order terms and conditions and allow for both the transfer of title and risk of loss at the point of shipment under GAAP.  For all of these reasons, revenue should not have been recognized upon shipment.

22.     From FY 2015 through FY 2017, Super Micro prematurely recognized more than $45 million in revenue in connection with sales to this customer.

### Improper Recognition of Revenue Before Obtaining Customer Acceptance

23.     A number of Super Micro's agreements with customers included acceptance clauses, meaning that customer acceptance was a condition of the customer's obligation to pay for the goods.  Under GAAP, revenue is considered to be earned when the seller has substantially accomplished what it must do to be entitled to the revenue.  Accordingly, where an agreement contains a substantive customer acceptance clause, permitting customers to return the goods if they did not meet the customer's specifications, revenue generally should not be recognized until Super Micro received confirmation of customer acceptance, the customer acceptance provision lapsed, or, alternatively, Super Micro received payment from the customer.

24.     Super Micro's internal accounting control for tracking customers with acceptance clauses, and for determining whether those clauses had been satisfied, was lacking for two reasons.  First, Super Micro had no adequate process to identify customers with acceptance clauses.  Acceptance clauses included in purchase orders or other transactional documents that evidenced the arrangements that Super Micro had with its customers were identified on an *ad hoc* basis by operations and sales employees who did not receive proper training or guidance on this topic.  Second, even in instances where Super Micro was aware of customer acceptance provisions, the determination of whether the condition was satisfied was reached haphazardly.  The decision was typically based on discussions between members of the finance group and sales personnel who did not receive any relevant training from Super Micro.  As a result, Super Micro recognized revenue in connection with numerous sales before it received customer acceptance.

### Improper Recognition of Revenue Upon Shipment of Goods That Were Incomplete or Mis-Assembled

25.     Super Micro also improperly recognized revenue for products that it sold where employees knew the goods were incomplete or mis-assembled at the time of shipment.  The goods were shipped to customers at the end of quarters and Super Micro improperly recognized the revenue before quarter-end.

26.     For example, at the end of FY 2016, Super Micro prematurely recognized $384,000 of revenue, while failing to ship certain products that were part of the customer's purchase order.  In an email sent several months later concerning shipment of the missing parts, a Super Micro employee explained "[d]ue to time constraint to meet June'16 year-end revenue target" certain goods were not originally shipped.  The employee went on to explain that "if we ship the accessory package [that the customer had ordered], we would miss the June year-end revenue."

6

27.     In a second example, Super Micro sent a $4 million order to a new customer towards the end of the same quarter.  While the goods were in transit, the customer informed Super Micro that the product included a wrong component.  As a result of the error, the products were shipped to a warehouse where they remained until Super Micro corrected the error.  Super Micro employees were required to spend significant time and effort over the following nearly two months to resolve the issue.  Nevertheless, Super Micro recognized the sale at the end of FY 2016.

28.     In another instance, Super Micro wanted to ship goods to a customer at the end of the second quarter of FY 2016.  However, Super Micro was unable to get all of the units to function properly before quarter end.  In order to recognize the revenue in the second quarter of FY 2016, a Super Micro sales employee instructed Super Micro employees to put green stickers on eight mis-assembled units.  At the time of shipment, the sales employee knew that Super Micro might have to take back and repair or replace the tagged units.

29.     Because Super Micro had not satisfied all of the necessary elements to recognize revenue under GAAP, Super Micro prematurely recognized revenue in these and other similar circumstances.

### Improper Recognition of Revenue Upon Shipment to a Large Super Micro Distributor

30.     Super Micro had a distributor customer to which it sold hundreds of millions of dollars in products from FY 2015 to FY 2017.  The distributor, however, was consistently unable to pay within its payment terms—its payables were often many months past due.  Super Micro received information on multiple occasions that the distributor's ability to pay was tied to its receipt of funds from its own customers (*i.e.*, end-customers).

31.     Numerous Super Micro employees, including executives, were aware of the distributor's delayed payments and the fact that the distributor could not pay Super Micro until it sold the products to end-customers and received payment from those customers.

32.     In light of these facts, under GAAP, Super Micro was required to recognize revenue when it received payments from its distributor customer.  Super Micro, however, prematurely recognized more than $150 million in total revenue at the time of shipment from FY 2015 through FY 2017.

### Improper Recognition of Revenue While Holding Customers' Bills of Lading

33.     Super Micro improperly recognized revenue while holding certain customers' bills of lading.  When Super Micro shipped goods to certain countries—primarily Russia and other Eastern European countries—Super Micro requested that the freight forwarders return the bills of lading to it.  Super Micro then held the bills of lading until it received payment (either partial or in full) from its customers.

34.     A bill of lading is a shipping document that allows a customer to clear products through customs.  Absent a bill of lading, a customer ordinarily cannot take possession of the goods.  Super Micro's practice was meant to ensure that Super Micro was paid by customers that had not paid in advance.

35.     In instances where Super Micro prevented customers from taking possession of goods until payment was received, revenue was not realized or realizable at the time of shipment under GAAP.  Accordingly, revenue should not have been recognized.

***Failure to Properly Account for Extended Warranties***

36.     Super Micro offered its customers the ability to purchase extended warranties on its products.  At times, these warranties were purchased separately from the cost of Super Micro products and listed separately on invoices.  With respect to certain types of products sold by Super Micro, however, customers received an extended warranty covering periods ranging from one to five years beyond the standard warranty, the cost for which was built into the price of the hardware products purchased.  These warranties were not explicitly listed in the invoice, purchase order or any other documents provided to accounting.

37.     Until 2015, Super Micro did not have any internal accounting control or process to identify products that included embedded warranties.  Salespeople and members of the operations team did not receive training on how to identify embedded warranties.

38.     Under GAAP, companies must account for revenue as earned, which for extended warranties is ratably over the duration of the warranty term.  Super Micro, instead, recognized all of the extended warranty revenue upfront.  Accordingly, Super Micro prematurely recognized all revenue from embedded extended warranties at the time of sale.

### B.  Super Micro Understated Certain Expenses

***Misuse of Cooperative Marketing Funds***

39.     Super Micro's customers often were entitled to cooperative, or "co-op", marketing funds based on their purchases of product from Super Micro.  As Super Micro stated in its SEC filings, as well as in its internal written policies, these funds were to be used for co-op marketing activities undertaken by Super Micro's customers.  The customers were entitled to receive reimbursement for a portion of the cost of these activities.

40.     At the time of each sale to customers who were entitled to receive co-op marketing funds, Super Micro accrued a liability and recorded an offsetting debit to contra revenue and marketing expense.  These liabilities were to pay for future marketing activities that customers would perform.  In reality, however, Super Micro improperly reduced the liabilities to avoid recognizing a variety of expenses unrelated to marketing.

41.     Super Micro used co-op marketing funds, without customer approval, for a variety of purposes unrelated to marketing.  For instance, Super Micro misused these funds to (a) pay shipping costs that were the responsibility of Super Micro; (b) pay to store goods at third-party facilities when customers were not prepared or willing to accept the goods before quarter-end; (c) recoup Super Micro losses in connection with goods that had been returned by customers (*e.g.*, in instances where the replacement products were more expensive); (d) pay for product repair costs requested by customers that had extended warranties; (e) pay for Christmas gifts given to

customers; (f) cover customer short-pays (*i.e.*, instances where invoices were not paid in full); and (g) pay for installation services that Super Micro performed for its customers.

42.     In using co-op marketing funds for purposes unrelated to marketing, Super Micro understated its expenses and liabilities.  Specifically, Super Micro should have recorded expenses when it incurred costs unrelated to marketing.  Instead, Super Micro reduced its co-op marketing liability account and did not record any expense.

43.     Separately, in connection with one of its vendor's co-op marketing programs (under which Super Micro was entitled to receive co-op marketing funds), Super Micro employees submitted claims for approximately $660,000 to which Super Micro was not entitled.  As a result of this conduct, Super Micro understated its expenses and overstated its income from at least FY 2013 through FY 2015.

***Overvaluation of Inventory***

44.     Super Micro engaged in two additional practices over the course of several years that systemically overstated inventory and understated expenses in Super Micro's books and records and publicly reported financial statements.  First, Super Micro failed to reduce inventory and record a research and development expense when its engineers used inventory for internal purposes, as was required by GAAP.  Second, Super Micro improperly continued to keep inventory on its books that had been provided to customers for testing purposes even when those products were never returned, as well as instances where it shipped items as replacement products to its customers.  These practices resulted in an understatement of cost of sales and overstatement of gross profit.

### C.  Super Micro's Material Weaknesses

45.     On May 17, 2019, Super Micro filed its FY 2017 Form 10-K.  In that filing, the company disclosed numerous material weaknesses in its Internal Control over Financial Reporting. These material weaknesses prevented Super Micro from recording transactions as necessary to permit the preparation of financial statements in conformity with GAAP.

46.     The company's material weaknesses included:

a.     Aggressively focusing on quarterly revenue without sufficient focus on compliance;

b.     A failure by senior management to establish and promote a control environment with an appropriate tone of compliance and control consciousness throughout the entire company;

c.     An inappropriate tone at the top; and

d.     A failure to hire personnel who had appropriate levels of knowledge and experience or to provide adequate training to its personnel.

**D.  Super Micro was Required to Restate Years' Worth of Financial Statements Included in Commission Filings**

47.     On August 3, 2017, Super Micro filed a Form 8-K with the Commission, announcing its operating and financial results for the fourth quarter of FY 2017.  Several weeks later, Super Micro announced that it would be unable to file its FY 2017 Form 10-K on time and, on September 15, 2017, it disclosed that it was performing an audit committee review to permit its auditor to complete its audit of the financial statements.  In November 2018, Super Micro determined that its previously filed financial statements from FYs 2015 through 2017 could not be relied upon.  Super Micro did not file any annual or quarterly reports from the time it filed its Form 10-Q for the third quarter of FY 2017 until May 2019, when Super Micro filed its FY 2017 Form 10-K.

48.     As a result of Super Micro's inability to file any financial statements for nearly two years, the company's stock was suspended from trading on the NASDAQ Stock Market and then de-listed.

49.     In May 2019, Super Micro filed its Form 10-K for the year ended June 30, 2017 and amended its Form 10-Q filings to restate its financial statements for the first three quarters of fiscal 2017.  The FY 2017 Form 10-K also restated the financial statements for fiscal years 2015 and 2016.  The restatements substantially impacted the company's revenue/net sales, gross profits, operating income and net income previously recorded in its books and records and previously reported in its filings with the Commission.

50.     Since discovering and correcting these financial statement errors, Super Micro improved its internal controls and reorganized its management team.  In January 2020, Super Micro's stock was relisted on the Nasdaq Global Market.

51.     The net effects of Super Micro's restatement are outlined in the charts below.[3]

---

[3]     The "net" effects represent the impact when reporting all errors in their proper periods. The gross effects of Super Micro's errors in any individual period are substantially larger, as revenue that was improperly and prematurely recognized in one period was corrected and recognized in later periods.

**FY 2015 (ending 6/30/2015) (in 000s)**

|  | **As Reported** | **As Restated** | **% Change** |
|---|---|---|---|
| Net Sales | 1,991,155 | 1,954,353 | (1.88%) |
| Income from Operations | 146,746 | 132,646 | (10.63%) |

**FY 2016 (ending 6/30/2016) (in 000s)**

|  | **As Reported** | **As Restated** | **% Change** |
|---|---|---|---|
| Net Sales | 2,215,573 | 2,225,022 | 0.42% |
| Income from Operations | 106,850 | 107,491 | 0.60% |

**2017 (ending 6/30/2017) (in 000s)**

|  | **As Reported[4]** | **As Restated** | **% Change** |
|---|---|---|---|
| Net Sales | 2,529,915 | 2,484,929 | (1.81%) |
| Income from Operations | 101,877 | 94,875 | (7.38%) |

### Super Micro's Remedial Efforts

52.     In determining to accept the Offer, the Commission considered remedial acts undertaken by Respondent.

### Violations

53.     As a result of the conduct described above, Super Micro violated Section 17(a)(2) and (3) of the Securities Act, which prohibit any person from directly or indirectly obtaining money or property by means of any untrue statement of a material fact or any omission to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser, in the offer or sales of securities.

54.     As a result of the conduct described above, Super Micro also violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11 and 13a-13 thereunder, which require issuers to file accurate annual, current and quarterly reports, which include such further information as may be necessary to make the required statements not misleading.

---

[4]     The FY 2017 reported amounts include fourth quarter FY 2017 net sales and income from operations reported in Super Micro's Form 8-K filed on August 3, 2017.

55. As a result of the conduct described above, Super Micro also violated Section 13(b)(2)(A) of the Exchange Act, which requires an issuer to make and keep books, records, and accounts which, in reasonable detail, accurately and fairly reflect the issuer's transactions and disposition of assets.

56. As a result of the conduct described above, Super Micro also violated Section 13(b)(2)(B) of the Exchange Act, which requires an issuer to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that:  transactions are executed in accordance with management's general and specific authorization; transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP or any other criteria applicable to such statements, and to maintain accountability for assets; access to assets is permitted only in accordance with management's general or specific authorization; and the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Super Micro's Offer.

Accordingly, it is hereby ORDERED that**:**

A. Pursuant to Section 8A of the Securities Act and Section 21C of the Exchange Act, Respondent Super Micro cease and desist from committing or causing any violations and any future violations of Sections 17(a)(2) and (3) of the Securities Act and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B), of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder.

B. Respondent shall, within 10 days of the entry of this Order, pay a civil money penalty in the amount of $17,500,000.00 to the Securities and Exchange Commission.  If timely payment is not made, additional interest shall accrue pursuant to 31 U.S.C. §3717.

Payment must be made in one of the following ways:

(1) Respondent may transmit payment electronically to the Commission, which will provide detailed ACH transfer/Fedwire instructions upon request;

(2) Respondent may make direct payment from a bank account via Pay.gov through the SEC website at http://www.sec.gov/about/offices/ofm.htm; or

(3) Respondent may pay by certified check, bank cashier's check, or United States postal money order, made payable to the Securities and Exchange Commission and hand-delivered or mailed to:

Enterprise Services Center
Accounts Receivable Branch
HQ Bldg., Room 181, AMZ-341

6500 South MacArthur Boulevard
Oklahoma City, OK 73169

Payments by check or money order must be accompanied by a cover letter identifying Super Micro Computer, Inc. as a Respondent in these proceedings, and the file number of these proceedings; a copy of the cover letter and check or money order must be sent to Lisa Deitch, Division of Enforcement, Securities and Exchange Commission, 100 F St., NE, Washington, DC 20549-5010.

C.      Pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, a Fair Fund is created for the penalties referenced in paragraph IV.B above.  Amounts ordered to be paid as civil money penalties pursuant to this Order shall be treated as penalties paid to the government for all purposes, including all tax purposes.  To preserve the deterrent effect of the civil penalty, Respondent agrees that in any Related Investor Action, it shall not argue that it is entitled to, nor shall it benefit by, offset or reduction of any award of compensatory damages by the amount of any part of Respondent's payment of a civil penalty in this action ("Penalty Offset").  If the court in any Related Investor Action grants such a Penalty Offset, Respondent agrees that it shall, within 30 days after entry of a final order granting the Penalty Offset, notify the Commission's counsel in this action and pay the amount of the Penalty Offset to the Securities and Exchange Commission.  Such a payment shall not be deemed an additional civil penalty and shall not be deemed to change the amount of the civil penalty imposed in this proceeding.  For purposes of this paragraph, a "Related Investor Action" means a private damages action brought against Respondent by or on behalf of one or more investors based on substantially the same facts as alleged in the Order instituted by the Commission in this proceeding.

By the Commission.

Vanessa A. Countryman
Secretary

13

Exhibit 2

# UNITED STATES OF AMERICA
### Before the
### SECURITIES AND EXCHANGE COMMISSION

**SECURITIES EXCHANGE ACT OF 1934**
**Release No. 89658 / August 25, 2020**

**ACCOUNTING AND AUDITING ENFORCEMENT**
**Release No. 4163 / August 25, 2020**

**ADMINISTRATIVE PROCEEDING**
**File No. 3-19929**

| | |
|---|---|
| In the Matter of<br><br>    CHARLES LIANG,<br><br><br>Respondent. | **ORDER INSTITUTING CEASE-AND-DESIST PROCEEDINGS PURSUANT TO SECTION 21C OF THE SECURITIES EXCHANGE ACT OF 1934, MAKING FINDINGS, AND IMPOSING A CEASE-AND-DESIST ORDER** |

## I.

The Securities and Exchange Commission ("Commission") deems it appropriate that cease-and-desist proceedings be, and hereby are, instituted pursuant to Section 21C of the Securities Exchange Act of 1934 ("Exchange Act") against Charles Liang ("Respondent").

## II.

In anticipation of the institution of these proceedings, Respondent has submitted an Offer of Settlement (the "Offer") which the Commission has determined to accept. Solely for the purpose of these proceedings and any other proceedings brought by or on behalf of the Commission, or to which the Commission is a party, and without admitting or denying the findings herein, except as to the Commission's jurisdiction over him and the subject matter of these proceedings, which are admitted, and except as provided herein in Section V, Respondent consents to the entry of this Order Instituting Cease-and-Desist Proceedings Pursuant to Section 21C of the Securities Exchange Act of 1934, Making Findings, and Imposing a Cease-and-Desist Order ("Order"), as set forth below.

## III.

On the basis of this Order and Respondent's Offer, the Commission finds[1] that:

### Summary

1.      Super Micro Computer, Inc., a producer of computer servers headquartered in California, engaged in improper accounting—prematurely recognizing revenue and understating expenses from at least fiscal year ("FY") 2015 through FY 2017.  As a result, Super Micro filed with the Commission materially misstated financial statements in its annual, quarterly and current reports during the period.

2.      Super Micro's executives pushed employees to maximize end-of-quarter revenue and minimize expenses, without devising and maintaining sufficient internal accounting controls to record revenue and expenses in conformity with U.S. Generally Accepted Accounting Principles ("GAAP").  Super Micro improperly accelerated revenue recognition and reporting through a number of improper practices.  Super Micro also improperly under-reported certain expenses by misusing its cooperative marketing program and by improperly accounting for certain inventory.

3.      On May 17, 2019, Super Micro filed with the Commission restated financial statements for previously-filed quarterly and annual reports for fiscal years 2015, 2016 and 2017.

4.      Charles Liang, Super Micro's Chief Executive Officer, received profits from stock sales during the 12-month periods following the filings containing financial results that Super Micro restated as a result of misconduct.  Liang has not, however, reimbursed Super Micro for those stock sales profits as required under Section 304(a) of the Sarbanes-Oxley Act.

### Respondent

5.      Charles Liang, age 62, is the President, Chief Executive Officer, and Chairman of the Board of Directors of Super Micro.  He has held those positions since founding the company in 1993.

### Related Entity

6.      Super Micro is a global producer of computer servers and equipment, incorporated in Delaware, with its principal place of business in San Jose, California.  Super Micro's securities are registered under Section 12(b) of the Exchange Act.  The company's fiscal year ends on June 30.  Super Micro's shares currently trade on the NASDAQ Global Select Market.  Because of Super Micro's pervasive accounting, reporting and internal accounting control issues, Super Micro was unable to file periodic reports for nearly two years and, as a result, trading in the company's

---

[1]      The findings herein are made pursuant to Respondent's Offer of Settlement and are not binding on any other person or entity in this or any other proceeding.

2

stock was suspended in August 2018 and the stock was then delisted from March 2019 through January 2020.

## Facts

### Super Micro's Premature Recognition of Revenue

7.      Super Micro executives pressed employees to maximize revenue at the end of quarters but failed to devise and maintain sufficient internal accounting controls with respect to proper revenue recognition.  For instance, Super Micro delegated responsibility for identifying sales terms that may affect revenue recognition to salespeople without training them on revenue recognition.  During the period from at least FY 2015 through the end of FY 2017, Super Micro systemically recognized, recorded in its books and records, and reported revenue prematurely by engaging in the following improper practices.

8.      Super Micro engaged in a number of transactions where it recognized revenue prior to customer delivery, in order to improperly accelerate revenue recognition at the end of quarters. In certain instances, Super Micro employees sent goods to warehouses or other storage facilities controlled by third parties at quarter-end and paid for the storage fees until the goods were delivered to its customer.  In other instances, Super Micro asked its freight forwarders to hold the goods until the date that the customer was prepared to accept the goods, rather than ship and deliver them on the date agreed to with the customer.  There also were instances where Super Micro recorded revenue although goods remained at its own warehouse.  In all of these transactions and other similar transactions, Super Micro improperly recorded revenue upon shipment from its own facility but prior to customer delivery or, in a few instances, before the goods even left its facility.  Recognizing the revenue was not in conformity with GAAP.

9.      Super Micro—at the end of quarters—shipped goods on multiple occasions prior to the delivery dates agreed with, or specified by, its customers in order to record and recognize the revenue prior to quarter-end.  Super Micro's recognition of revenue when it shipped goods in contravention of customer instructions did not conform with GAAP.

10.     From at least 2014 through 2017, purchase orders submitted by a large customer specified "FOB Destination" as the shipping terms.  Sales with FOB Destination shipping terms are not realized or earned until delivery has occurred at the customer-designated location and title to the goods has passed to the customer.  Super Micro, however, improperly recorded revenue upon shipment to the customer.  From FY 2015 through FY 2017, Super Micro prematurely recognized more than $45 million in revenue in connection with sales to this customer.

11.     Super Micro prematurely recognized revenue in connection with sales transactions that included customer acceptance clauses.  Where an agreement contains a substantive customer acceptance clause, permitting customers to return the goods if they did not meet the customer's specifications, revenue generally should not be recognized until Super Micro received confirmation of customer acceptance, the customer acceptance provisions lapsed, or, alternatively, Super Micro received payment from the customer.  Super Micro's internal accounting control for

tracking customers with acceptance clauses, and for determining whether those clauses had been satisfied, was lacking.  As a result, Super Micro recognized revenue in connection with numerous sales before it received customer acceptance.

12.     Super Micro improperly recognized revenue for products that it sold where employees knew the goods were incomplete or mis-assembled at the time of shipment.  The goods were shipped to customers at the end of quarters so that Super Micro would recognize the revenue before quarter-end.

13.     Super Micro had a distributor customer to which it sold hundreds of millions of dollars in products from FY 2015 to FY 2017.  The distributor, however, was consistently unable to pay within its payment terms—its payables were often multiple months past due.  Super Micro received information on multiple occasions that the distributor's ability to pay was tied to its receipt of funds from its own customers (*i.e.*, end-customers).  In light of these facts, under GAAP, Super Micro was required to recognize revenue when it received payments from its distributor customer.  Super Micro, however, prematurely recognized more than $150 million in total revenue at the time of shipment from FY 2015 through FY 2017.

14.     Super Micro improperly recognized revenue while holding certain customers' bills of lading.  Absent a bill of lading, a customer ordinarily cannot take possession of the goods.  In instances where Super Micro prevented customers from taking possession of goods until payment was received, revenue was not realized or realizable at the time of shipment under GAAP.  Accordingly, revenue should not have been recognized.

15.     Super Micro prematurely recognized revenue on certain extended warranties it sold to customers by recognizing the revenue at the time of sale, rather than ratably over the duration of the warranty term.

### Super Micro's Understatement of Expenses

16.     Super Micro also improperly under-reported expenses by misusing its cooperative marketing funds, without customer approval, for a variety of purposes unrelated to marketing, such as warehousing costs for goods at quarter-end, shipping costs, and product repair costs.  Cooperative marketing funds were supposed to be used for cooperative marketing activities undertaken by Super Micro's customers.  At the time of each sale to customers who were entitled to receive co-op marketing funds, Super Micro accrued a liability and recorded an offsetting debit to contra revenue and marketing expense.  These liabilities were to pay for future marketing activities that customers would perform.  In reality, however, Super Micro improperly reduced the liabilities to avoid recognizing a variety of expenses unrelated to marketing.  In using cooperative marketing funds for purposes unrelated to marketing, Super Micro understated its expenses and liabilities.  In addition, Super Micro over-valued inventory and under-stated expenses by failing to reduce inventory and record an associated expense in instances where Super Micro no longer held the inventory for sale.

## Super Micro's Restatement

17.     On August 3, 2017, Super Micro filed a Form 8-K with the Commission, announcing its operating and financial results for the fourth quarter of FY 2017.  Several weeks later, Super Micro announced that it would be unable to file its FY 2017 Form 10-K on time and, on September 15, 2017, it disclosed that it was performing an audit committee review to permit its auditor to complete its audit of the financial statements.  In November 2018, Super Micro determined that its previously filed financial statements from FYs 2015 through 2017 could not be relied upon.  Super Micro did not file any annual or quarterly reports from the time it filed its Form 10-Q for the third quarter of FY 2017 until May 2019, when Super Micro filed its FY 2017 Form 10-K.

18.     As a result of Super Micro's inability to file any financial statements for nearly two years, the company's stock was suspended from trading on the NASDAQ Stock Market and then de-listed.

19.     In May 2019, Super Micro filed its Form 10-K for the year ended June 30, 2017 and amended its Form 10-Q filings to restate its financial statements for the first three quarters of FY 2017.  The FY 2017 Form 10-K also restated the financial statements for FYs 2015 and 2016.  The restatements substantially impacted the company's revenue/net sales, gross profits, operating income and net income previously recorded in its books and records and previously reported in its filings with the Commission.

## Compensation and Stock Sales of CEO Liang

20.     During the 12-month periods that followed the filing of financial statements in Super Micro's quarterly and annual reports requiring restatement, Liang realized profits from his sales of Super Micro stock.

21.     Liang has not reimbursed those amounts to Super Micro.

## Violation

22.     Section 304 of the Sarbanes-Oxley Act of 2002 requires the chief executive officer or chief financial officer of any issuer required to prepare an accounting restatement due to material noncompliance with the securities laws as a result of misconduct to reimburse the issuer for, among other things, any profits realized from the sale of securities of the issuer during that 12-month periods following the public issuance or filing containing the financial results that were required to be restated.  Section 304 does not require that a chief executive officer or chief financial officer engage in misconduct to trigger the reimbursement requirement.  Liang received profits from his sales of securities during 12-month periods following filings containing financial results that Super Micro was required to restate.  He has not, to date, reimbursed Super Micro for those amounts.  Liang has, therefore, violated Sarbanes-Oxley Section 304.

**IV.**

In view of the foregoing, the Commission deems it appropriate to impose the sanctions agreed to in Respondent Liang's Offer.

Accordingly, it is hereby ORDERED that:

A.      Pursuant to Section 21C of the Exchange Act, Respondent Liang cease and desist from committing or causing any violations and any future violations of Section 304 of the Sarbanes-Oxley Act of 2002.

B.      Respondent Liang shall, within 10 days of the entry of this Order, reimburse Super Micro for a total of $2,122,000 pursuant to Section 304(a) of Sarbanes-Oxley Act of 2002. Respondent shall simultaneously deliver proof of satisfying this reimbursement obligation to Lisa Deitch, Division of Enforcement, Securities and Exchange Commission, 100 F Street Northeast, Washington, DC 20549.

**V.**

It is further Ordered that, solely for purposes of exceptions to discharge set forth in Section 523 of the Bankruptcy Code, 11 U.S.C. §523, the findings in this Order are true and admitted by Respondent, and further, any debt for disgorgement, prejudgment interest, civil penalty or other amounts due by Respondent under this Order or any other judgment, order, consent order, decree or settlement agreement entered in connection with this proceeding, is a debt for the violation of the federal securities laws or any regulation or order issued under such laws, as set forth in Section 523(a)(19) of the Bankruptcy Code, 11 U.S.C. §523(a)(19).

By the Commission.


Vanessa A. Countryman
Secretary